**CONTINUATION OF APPLICATION FOR SEARCH WARRANT**

**INTRODUCTION**

1.      I am a Special Agent with the U.S. Department of Health and Human Services,
Office of Inspector General ("HHS-OIG"), and have been so employed for approximately six
years.  In that capacity, I am authorized to conduct investigations of violations of federal
criminal law.  I am currently assigned to HHS-OIG's Detroit, Michigan Division, Grand Rapids
Resident Agency, where my duties include investigating a multitude of violations, including
health care fraud.  Prior to my employment with HHS-OIG, I was employed as a Special Agent
with the United States Secret Service for approximately 7 years.  In that capacity, I had
experience investigating criminal activities that involved, among other things, bank fraud,
counterfeit currency and negotiable instruments, and identity theft.

2.      I make this affidavit in support of an application for a search warrant for
information associated with Google accounts associated with Lifeline Recruiting, LLC
("Lifeline"), a locum-tenens company based in Boca Raton, Florida (defined in more detail
below), that are stored at premises controlled by Google LLC ("Google"), an email provider
headquartered at 1600 Amphitheatre Parkway, Mountain View, CA, 94043.  The information to
be searched is described in the following paragraphs and in Attachment A.   This affidavit is
made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a),
2703(b)(1)(A) and 2703(c)(1)(A) to require Google to disclose to the government copies of the
information (including the content of communications) further described in Section I of
Attachment B.  Upon receipt of the information described in Section I of Attachment B,
government-authorized persons will review that information to locate the items described in
Section II of Attachment B.

1

3.      The control, operation, and use of Google accounts listed in Attachment A and located at Google has been confirmed by interviews with multiple individuals and review of records obtained during this investigation.

4.      The facts set forth in this affidavit are based on my personal knowledge, knowledge obtained during my participation in this investigation from other individuals, consultation with the U.S. Attorney's Office for the Western District of Michigan (the "U.S. Attorney's Office"), my review of documents, records, and photographs, other records relating to this investigation, communications with others who have personal knowledge of the events and circumstances described herein, and information gained through my training and experience. Because this affidavit is submitted for the limited purpose of establishing probable cause in support of a search warrant, it does not set forth each and every fact that I have learned during the course of this investigation.

5.      As set forth in more detail below, this investigation has revealed that Lifeline is a company that recruited practitioners, including some in the Western District of Michigan, to prescribe durable medical equipment ("DME") on behalf of Lifeline's client, Consults Direct, and that those practitioners wrote prescriptions for DME that were not medically necessary.  As a result of its role in recruiting these practitioners and communicating with these practitioners and Consults Direct (and its employees) about the prescriptions for DME, there is probable cause to search Lifeline's Google accounts for evidence, instrumentalities, and/or fruits of these crimes by Consults Direct and the individual practitioners.  The investigation further revealed that Lifeline and its officers and employees were aware of, and aided and abetted, Consults Direct in a nationwide healthcare fraud and kickback scheme involving the submission of false claims to government healthcare programs for, among other items, the provision of DME to Medicare

2

beneficiaries.  Therefore, probable cause exists to search Lifeline's Google accounts for evidence, instrumentalities, and/or fruits of these crimes.  Additionally, recent investigation has revealed that Lifeline is currently supplying contract practitioners on behalf of a different client for the approval of genetic cancer testing for Medicare beneficiaries.  Based on the investigation to date, there is probable cause that this new client is obtaining practitioners' orders for genetic cancer testing of Medicare beneficiaries that are not medically necessary.  As set forth below, there is probable cause that there exists evidence, instrumentalities, and/or fruits of all of these crimes in Lifeline's Google accounts.

6.     Thus, based on an investigation by HHS-OIG, the U.S. Attorney's Office, and the Federal Bureau of Investigation ("FBI"), there is probable cause to believe that violations of 18 U.S.C. § 1349 (Conspiracy to Commit Health Care Fraud and Wire Fraud), 18 U.S.C. § 1343 (Wire Fraud), 18 U.S.C.§ 1347 (Health Care Fraud), 18 U.S.C. § 1035 (False Statements Relating to Health Care Matters), 18 U.S.C. § 371 (Conspiracy to Defraud the United States and to Pay and Receive Health Care Kickbacks), 42 U.S.C. § 1320a-7b (Solicitation and Receipts of Kickbacks), and 18 U.S.C. § 2 (Aiding and Abetting Health Care Fraud, Wire Fraud, False Statements Relating to Health Care Matters, and Paying and Receiving Health Care Kickbacks) have been committed.  There is also probable cause to search the information described in Attachment A for evidence, instrumentalities, and/or fruits of these crimes further described in Attachment B.

## **JURISDICTION**

7.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711, 18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court is "a district court of the United States that has jurisdiction

over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i). Providers are required to

disclose records responsive to this search warrant that are "within such provider's possession,

custody, or control, regardless of whether such communication, record, or other information is

located within or outside of the United States." 18 U.S.C. § 2713.

### KEY INDIVIDUALS AND ENTITIES INVOLVED

8.      **Sajid ("Jay") Geronimo**, a resident of Orange County, California, owned and

operated Cure Healthcare, Inc.  Mr. Geronimo was previously charged in December 2014 with

elder abuse and grand theft in California.  More recently, Mr. Geronimo pleaded guilty in

October 2020 in the U.S. District Court for the Middle District of Florida to one count of

Conspiracy to Commit Healthcare Fraud for his role in the DME fraud scheme described in more

detail below.

9.      **Cure Healthcare, Inc.** (referred to throughout as "Consults Direct") was a

"marketing" company located in Newport Beach, California, that targeted the Medicare-aged

population to promote DME, including knee braces, wrist braces, and back braces.  Cure

Healthcare, Inc. also did business under the name of **Consults Direct**.

10.      **Ardalaan ("Armani") Adams** and **Charles Burruss** were co-owners and co-

operators of Ever Prime Concepts, Inc. ("Ever Prime"), a "management" company located in San

Diego, California, which controlled, owned, held financial interests in, and managed numerous

Medicare-enrolled DME supply companies. Both Mr. Adams and Mr. Burruss pleaded guilty in

October 2020 in the U.S. District Court for the Middle District of Florida to one count of

conspiracy to defraud the United States related to their role in the DME fraud scheme described

in more detail below.  The government's investigation revealed that Consults Direct was one of

multiple "marketing" companies that sold practitioner-signed DME orders to Ever Prime companies in exchange for the payment of money.

11.     ***InWerx*** purports to be a provider of healthcare managed IT services with clients who offer cancer genetic laboratory testing, including through AmeriHealth Laboratory.

12.     ***AmeriHealth Laboratory ("AmeriHealth")*** is a laboratory reportedly located in Texas that performs cancer genetic laboratory testing.

13.     ***Lifeline Recruiting, Inc. ("Lifeline")*** is a healthcare recruiting company based in Boca Raton, Florida.  According to its website, Lifeline purports to provide "both permanent and locum tenens (temporary) experienced clinicians for virtually every specialty and need – to various hospitals, clinics, and other facilities nationally.  We partner with qualified firms that provide the telemedicine technology for the provider, the patient, and even the facility."  One of Lifeline's clients was Sajid ("Jay") Geronimo's company, Consults Direct.  Another one of Lifeline's current clients is InWerx.  Lifeline's website and email accounts are hosted by Google and are the subject of this search warrant.

14.     ***Alicia Hiller*** is the President of Lifeline.

## PROBABLE CAUSE

### The Medicare Program

15.     The Medicare Program ("Medicare") was a federal health care benefit program that provided items and services to individuals who were (a) age 65 or older, (b) had certain disabilities, or (c) had end-stage renal disease. Individuals who received Medicare benefits were called "beneficiaries."

16.     Medicare was a "health care benefit program," as defined by Title 18, United States Code, Section 24(b), in that it was a public or private plan or contract, affecting

commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service, for which payment may be made under the plan or contract.

17.     The Centers for Medicare and Medicaid Services ("CMS"), which was an agency of the United States Department of Health and Human Services ("HHS"), administered Medicare.

**Medicare Part B and General Requirements for Durable Medical Equipment**

18.     Medicare was made up of several component "parts" that covered different items and services.  Medicare Part B covered, among other items and services, outpatient care and supplies, including orthotic devices, referred to as DME.  Medicare Part B covered claims submitted for DME, such as off-the-shelf knee braces, if the DME was medically reasonable and necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed medical practitioner.

19.     DME companies, medical professionals, and other health care providers that provide services to Medicare beneficiaries are referred to as Medicare "providers."  To participate in Medicare, providers are required to submit an application in which the providers agree to comply with all Medicare-related laws and regulations.  If Medicare approves a provider's application, Medicare assigns the provider a Medicare "provider number."  A healthcare provider with a Medicare provider number can file claims with Medicare to obtain reimbursement for services rendered to beneficiaries.

20.     Enrolled Medicare providers agree to abide by Medicare's policies and procedures, rules, and regulations governing reimbursement.  To receive Medicare funds, enrolled providers are required to abide by the Anti-Kickback Statute and other laws and

regulations.  Providers are given access to Medicare manuals and service bulletins describing billing procedures, rules, and regulations.

21.      Medicare reimburses DME companies, medical professionals, and other healthcare providers for items and services rendered to beneficiaries.  To receive payment from Medicare, providers submit or cause the submission of claims to Medicare electronically, through interstate wires, either directly or through a billing company.

22.      To help administer Medicare, CMS contracted with private insurance companies called "Medicare Administrative Contractors" or "MACs." MACs performed many functions, such as enrolling DME suppliers into the Medicare program and processing Medicare claims.

23.      Under Medicare Part B, beneficiaries could only receive Medicare-covered DME from "suppliers" that were enrolled in Medicare.

24.      Medicare claims for DME claims involving beneficiaries residing in Michigan were processed by CGS Administrators, LLC ("CGS"), the MAC for the jurisdiction including Michigan.

25.      Pursuant to Medicare requirements, DME supply companies must submit certain information relating to the beneficiary receiving the DME supplies, including the following:

    a.  the type of service provided, identified by an "HCPCS" code (meaning "Healthcare Common Procedure Coding System");

    b.  the date of service or supply;

    c.  the referring physician's NPI;

    d.  the charge for such services;

    e.  patient's diagnosis;

    f.  the NPI for the DME entity seeking reimbursement; and

7

g. certification by the DME provider that the supplies are medically necessary.

26. Further, before submitting a claim for an orthotic brace to CGS, a DME supply company must have on file the following:

a. written documentation of a verbal order or a preliminary written order from a treating physician;

b. a detailed written order from the treating physician;

c. information from the treating physician concerning the beneficiary's diagnosis;

d. any information required for the use of specific modifiers;

e. a beneficiary's written assignment of benefits; and

f. proof of delivery of the orthotic brace to the beneficiary.

27. A claim for DME submitted to Medicare qualifies for reimbursement only if it was medically necessary for the treatment of the beneficiary's illness or injury and prescribed by a licensed medical professional.  Medicare would not pay a claim for DME for which a doctor's order had been procured through kickbacks.

### The Consults Direct DME Fraud Scheme

*Investigation Identified Multiple West Michigan Practitioners Who Prescribed Over $500,000 of Paid DME Orders Handled by Targets of a Nationwide DME Fraud and Kickback Scheme*

28. In 2019, the U.S. Department of Justice coordinated two separate nationwide takedowns addressing large-scale fraud schemes involving DME and genetic testing.  HHS-OIG opened up a series of related parallel investigations directed at practitioners in the Western District of Michigan whose Medicare data showed large spikes in their referring of Medicare beneficiaries for DME.

29. The national investigations established that marketers (often using foreign call centers and other means) aggressively solicited Medicare beneficiaries and obtained their

Medicare information.  The marketers then created prescription/orders, purported exam notes (based on phone calls with the beneficiaries), and letters of medical necessity for DME (primary back, knee, ankle and wrist braces).  The marketers then either directly, or through contracts with *locum tenens* contractors, arranged for medical practitioners to perform "consultations" and sign off on the prescriptions for medical braces.  Some practitioners also had the ability to review the recorded phone calls with the beneficiaries.  The recorded calls with the beneficiaries were often performed by foreign call centers and did not involve any real physical examinations of the patients.  This investigation revealed that the practitioners commonly signed off on the DME orders with little or no examination of the actual records.  The marketers then sold the completed orders for DME to various DME companies, constituting illegal kickbacks.

30.     One of the practitioners investigated in the Western District of Michigan by HHS-OIG and the U.S. Attorney's Office was a semi-retired infectious disease specialist located in Petoskey, Michigan, named Hugh G. Deery II, M.D.  The investigation revealed that Dr. Deery contracted with Lifeline to perform *locum tenens* work (the term of art used to describe part-time or fill-in work by medical professionals) for Consults Direct.  According to Medicare claims data, from about December 2018 through March 2019, Dr. Deery referred Medicare beneficiaries for DME (orthotic braces) totaling approximately $1.1 million (see Figure 1).  Medicare paid approximately $500,000 for these DME orders referred by Dr. Deery.



*Figure 1 (Deery DME Orders)*

31.     A review of records obtained during the investigation revealed that Dr. Deery signed numerous orders specifically for knee braces.  The associated medical records purportedly supporting these DME orders repeatedly reflected physical testing that was not—and could not have been—done and were inconsistent both with the recorded intake/triage phone calls and subsequent law enforcement interviews with the Medicare beneficiaries.

32.     For example, Medicare claims data reveals that Dr. Deery ordered a set of multiple braces, including bilateral (right and left) knee braces, for Medicare beneficiary V.S., a resident of Jackson, Michigan, in or around December 2018.  The associated medical records contain numerous findings that are inconsistent with the recording of the patient interview made available to Dr. Deery on Consults Direct's online portal.  For example, the following are inconsistencies between the findings contained in the medical records for the knee braces and the recorded phone call with the patient during which this information was purportedly obtained: The chief complaint was not knee pain; the purported conditions that aggravated the patient's pain did not include "bending" or "standing"; the stated source of pain was not arthritis ("I don't know"); the patient did not indicate "clicking, grinding, and popping" noises in her knee; the patient did not indicate "weakness of the knee requiring stabilization"; there was no examination to determine a finding of "no deformity"; there was no pivot shift test performed; there was no Cabot's maneuver test performed; there was no one-legged stand test performed; there was no Varus/Valgus Genu Valgum observation conducted; and there was no "conversation" with the patient and Dr. Deery.

33.     When government investigators interviewed V.S. on or around August 3, 2020, V.S. stated that she was often contacted by telemarketers.  V.S. recalled that she received a

package likely containing braces at the end of 2018, but she refused to accept the package from the carrier because she did not need medical braces.  V.S. told investigators that she has never met, heard of, or talked to Dr. Deery.

34.    A review of the claims data reveals that Medicare paid a DME supplier $1,396.90 for these knee braces ordered by Dr. Deery.

35.    Another one of the practitioners investigated in the Western District of Michigan was Colleen Browne, D.O., a physician located in Portland, Michigan.  The investigation revealed that Dr. Browne also contracted with Lifeline to review and approve DME orders on behalf of Consults Direct.  According to Medicare claims data, from about the second half of 2017 through March 2019, Dr. Browne referred Medicare beneficiaries for DME totaling approximately $1,893,000 (see Figure 2), some of which is attributable to her work with Consults Direct.  Medicare paid approximately $923,000 for these DME orders referred by Dr. Browne.



*Figure 2 (Browne DME Orders)*

36.    A review of records obtained during the investigation revealed that Dr. Browne signed numerous orders specifically for knee braces.  The associated medical records purportedly

supporting these DME orders repeatedly reflected physical testing that was not—and could not have been—done and were inconsistent both with the recorded intake/triage phone calls and subsequent law enforcement interviews with the Medicare beneficiaries.

37.    For example, Medicare claims data reveals that Dr. Browne ordered a left knee brace for Medicare beneficiary R.B., a resident of Climax, Michigan, in or around February 2019.  The associated medical records contain numerous findings that are inconsistent with the recording of the patient interview made available to Dr. Browne on Consults Direct's online portal.  For example, the following are inconsistencies between the findings contained in the medical records and the recorded phone call with the patient during which this information was purportedly obtained: The chief complaint was not knee pain; the purported conditions that aggravated the patient's pain did not include "bending" or "standing"; the stated source of pain was not arthritis (accident); the patient did not indicate "clicking, grinding, and popping" noises in his knee; the patient did not indicate "weakness of the knee requiring stabilization"; there was no examination to determine a finding of "no deformity"; there was no pivot shift test performed; there was no Cabot's maneuver test performed; there was no one-legged stand test performed; and there was no Varus/Valgus Genu Valgum observation conducted.

38.    When government investigators interviewed R.B. on or around October 12, 2020, R.B. stated that he recalled receiving a telemarketing call approximately two years ago about receiving a back brace.  He has, more recently, received more telemarketing calls regarding medical braces from persons often having foreign accents, indicating that they represent Medicare.  During the call two years ago, he was not asked to do any physical tests.  After the phone call, R.B. received a back brace, and also knee, shoulder, wrist, and ankle braces.

39.     A review of the claims data reveals that Medicare paid a DME supplier for multiple braces ordered by Dr. Browne, including $698.45 for a knee brace.

40.     A separate investigation in Florida revealed that Sajid ("Jay") Geronimo operated Consults Direct, one of the marketing companies shut down during the nationwide takedown in April 2019.   Mr. Geronimo pleaded guilty in October 2020 in the U.S. District Court for the Middle District of Florida to one count of Conspiracy to Commit Healthcare Fraud.  The Felony Information (8:20-cr-00249) filed in the U.S. District Court for the Middle District of Florida set forth, in part:

 a. Mr. Geronimo ran Consults Direct as a telemarketing operation "targeting the Medicare-aged population to generate DME brace orders."

 b. Mr. Geronimo and Consults Direct purchased "'leads'—meaning patient data and call recordings—generated by 'marketers' and call centers."

 c. The call centers representatives made written electronic records of the calls and often recordings of the calls.

 d. Mr. Geronimo and Consults Direct transmitted the Medicare beneficiaries' DME brace orders to medical practitioners through intermediaries.

 e. Often, the medical practitioners signed the DME brace orders without ever contacting the Medicare beneficiaries.

 f. After the DME brace orders were signed, Consults Direct sold the signed orders to DME supply companies who submitted corresponding claims to Medicare for millions of dollars in DME supplies.

41.     That same investigation revealed that two individuals, Ardalaan "Armani" Adams and Charles Burruss, were the co-owners and co-operators of Ever Prime Concepts, Inc. ("Ever

Prime"), a "management" company located in San Diego, California, which controlled, owned, held financial interests in, and managed numerous Medicare-enrolled DME supply companies. Both Mr. Adams (No. 8:20-cr-00294) and Mr. Burruss (No. 8:20-cr-00293) pleaded guilty in October 2020 in the U.S. District Court for the Middle District of Florida to one count of conspiracy to defraud the United States related to their role in the DME fraud scheme, including to offering and paying illegal bribes and kickbacks through marketing companies, including Consults Direct, resulting in payment of over approximately $180,000,000 by federal health benefit programs, including Medicare.

*In Cooperation with the Government's Investigation, Dr. Deery and Dr. Browne Provided Documents and Statements Related to Their Work with Consults Direct Through Lifeline*

42.     After being advised of the government's investigation, Dr. Deery participated in a proffer interview on or about September 21, 2020.  Dr. Deery stated that on December 6, 2018, he received an e-mail via LinkedIn that advertised a "rare tele-med opportunity" with a company called Lifeline Recruiting (i.e., Lifeline).  A corresponding advertisement stated that each consult would take 3-5 minutes.  He replied to the e-mail and expressed his interest.  He received a credentialing request, a contract, and other paperwork from Lifeline.  On December 7, 2018, he received a link to a tutorial on how to login and review cases in the Consults Direct portal.  His contacts at Lifeline Recruiting were Mary Hajjar and Alicia Hiller.

43.     Dr. Deery explained that his work with Consults Direct through Lifeline consisted of reviewing patient documentation and approving or denying DME brace orders for the patients. The DME order reviews that he conducted were on what is commonly known as a "portal."  The documentation he received was populated with information obtained from the patients during telephone calls.  The patient information in the portal was filled out before he reviewed it.  He

14

was told by Lifeline that the phone calls with patients regarding medical braces were done by certified medical assistants.

44.     According to Dr. Deery, no one at Lifeline mentioned a requirement that he listen to the recordings of phone calls with patients.  While Dr. Deery listened to the recorded phone calls when he first started reviewing DME orders, he soon stopped listening to the recording entirely because he felt that listening to the calls did not contribute to the decision about need for the braces.  Further, Dr. Deery stated that he felt uncomfortable while listening to the recorded calls.  He thought that the recorded patient calls were not done well.  The callers did not sound like medical people and they were not professional.  Some of the recorded calls seemed like braces were being forced on the patient.

45.     Dr. Deery admitted that, while he was working for Consults Direct, he began having concerns regarding the legitimacy of prescribing DME.  These concerns included the following:  He was surprised by the large number of people in Michigan that were receiving medical braces.  He was concerned about the phone call recordings that he did listen to.  In some cases, it seemed like the patient was being pressured.  He also acknowledged that the callers did not sound like medical professionals, as he had been told.  He noticed some discrepancies in the recordings that he listened to and the so-called triage notes in the portal.  There was also pressure from Lifeline Recruiting to get the brace orders done.  He felt this pressure was unprofessional. He received e-mails from Mary Hajjar or Alicia Hiller about his queue of medical orders backing up.  There was also pressure from Alicia Hiller at Lifeline to not deny the medical brace orders. Finally, during the time that he was approving medical braces, he received a call from a telemarketer who asked him about his own joint pain.  He thought this call sounded like the patient recordings that he had listened to when approving medical braces.

46.     Dr. Deery admitted that, at some point, he went on "auto-pilot" and just approved the orders for medical braces.  He did not think about the consequences.  Dr. Deery noted that this work was significantly different from the legitimate telemedicine services that he provided during his career.  Dr. Deery stated that he was embarrassed and ashamed of what he did.  He added that he is deeply saddened and sorry and wishes it had never happened.

47.     Dr. Deery also supplied law enforcement investigators with copies of emails sent from Lifeline personnel, including Mary Hajjar (mary@lifelinerecruiting.com) and Alicia Hiller (alicia@lifelinerecruiting.com).

48.     On or about December 15, 2020, Dr. Colleen Browne also participated in a proffer interview with law enforcement investigators after being advised of the investigation.  Dr. Browne thought that she started working with Lifeline in the summer of 2018 after being approached via email by Alicia Hiller about a telemedicine opportunity.  Dr. Browne confirmed that most of her communication with Ms. Hiller was via email and that Ms. Hiller's email address was alicia@lifelinerecruiting.com.

49.     Dr. Browne also stated that she had email communications with Lifeline employees she identified as "Shawnis McFarland" and "Janice Azure."  Dr. Browne supplied law enforcement investigators with copies of emails sent from or copying Lifeline personnel, including Alicia Hiller (alicia@lifelinerecruiting.com), Shawnis McFarland (Shawnis@lifelinerecruiting.com), and Jay Olsen (jay@lifelinerecruiting.com).

50.     Dr. Browne stated that Consults Direct was a client of Lifeline and that she began doing work for Consults Direct.  Dr. Browne also explained that she asked Ms. Hiller whether Consults Direct was compliant with medical field rules, and that Ms. Hiller responded that both

Consults Direct and Lifeline are compliant with the rules.  Neither Lifeline nor Consults Direct provided Dr. Browne with any training on medical necessity or billing practices.

51.   Dr. Browne explained that her work with Consults Direct consisted of a review and authorization of DME orders for patients.  Dr. Browne stated that she had access to patient phone call recordings through the Consults Direct portal, which "pre-populated" answers to the intake/triage notes.  Dr. Browne noted, however, that the pre-populated intake/triage notes were sometimes inconsistent with the information provided by the patients during the recorded phone calls.

52.   Dr. Browne related that, sometimes, it appeared as if someone had entered her online profile on the Consults Direct portal and changed her denial of some DME orders to approved.  When she raised these concerns with Alicia Hiller and Consults Direct, they would assure her that the platform would be fixed.

53.   When the Consults Direct online portal went down in April 2019—coinciding with the nationwide takedown at that same time—Ms. Hiller told her that the platform had been taken down to be fixed and to make it more compliant.

54.   When Dr. Browne learned of the federal law enforcement takedown of certain DME providers, she asked Ms. Hiller about the takedown.  Ms. Hiller responded that Lifeline is a small company and that Medicare would not look at her.  Ms. Hiller further stated that Medicare would look at bigger companies and that Lifeline would "fly under the radar."  In that conversation, however, Ms. Hiller denied that anything was done wrong at Consults Direct.

55.   Dr. Browne stated that she feels sick over her involvement with ordering DME.

**Government Investigators Contacted Other Practitioners Who Quit Working for Consults Direct Through Lifeline and Who Warned Lifeline That the DME Orders Were Medically Inappropriate and May Be Part of a DME Fraud or Kickback Scheme**

56.     From a review of records provided by Sajid Geronimo, the owner of Consults Direct, including purported screenshots from Google Hangouts communications between Consults Direct employees and Lifeline employees (discussed in more detail below), investigators identified a number of practitioners who related concerns about the practices of Consults Directs to Lifeline, including to Alicia Hiller.

*A Physician in Georgia Recruited by Lifeline Quit Within One Day of Reviewing Consults Direct Records, Expressed Concerns About the Adequacy of the Medical Records, and Warned Lifeline that Consults Direct's Payments Were More Like Kickbacks*

57.     One of the practitioners identified in the Google Hangout communications was Dr. Chadi Obeid.  On November 10, 2020, investigators interviewed Dr. Obeid.  Dr. Obeid indicated that he is a physician specializing in internal medicine and urology in Georgia.  In December 2018, Dr. Obeid received an email from Lifeline that advertised a telemedicine opportunity that involve case reviews of DME orders for Medicare patients.  His initial contact at Lifeline was Julie Tremmel, and he also spoke with an "Alicia," the "CEO of Lifeline," by phone on one occasion.  He also identified Alicia's email address as alicia@lifelinerecruiting.com. Records subsequently provided by Dr. Obeid identified Julie Tremmel's email address as JulieT@lifelinerecruiting.com.

58.     Dr. Obeid stated that Lifeline represented that each review should not take him more than five minutes to complete, and that his compensation was to be $30 per review.  He did not receive any training related to the medical necessity for the DME braces.  Dr. Obeid explained that the review required him to log onto a web-based platform owned and operated by

Consults Direct.  Lifeline did not explain his role to him in an exact manner, but only told him that he would review the information on the portal for medical necessity.

59.     Dr. Obeid first obtained access to the Consults Direct portal on December 27, 2018.  The portal contained recordings of phone calls with patients that appeared to be conducted by sales representatives outside of the United States.  Dr. Obeid stated that the callers did not sound like medical professionals and did not ask questions with proper structure.  Some of the Medicare beneficiaries were uncertain of the purpose of the call.

60.     Dr. Obeid further stated that the information in the portal did not always match the information given by the patient in the recorded phone call.  None of the DME orders seemed appropriate because there was no examination of the patient and because there were no medical records for him to review.

61.     Dr. Obeid recounted that he thought that DME companies were using Lifeline to pay him as a way to get around kickback issues.

62.     Dr. Obeid stated that he emailed Alicia and then had a conversation with her about his concerns that he did not have necessary medical records and that some of the patients did not want the DME braces.  During this phone call, Alicia responded that this was the first time that she had heard these concerns and that other doctors she worked with are fine with Lifeline and Consults Direct.  As described in more detail below, this response by Alicia was contradicted by a message she had previously shared on Google Hangouts on December 15, 2018, from a Dr. Mark Koivula, stating: "Long story short, I am concerned about medicare fraud with this company and resign effective immediately! I do also plan on contacting medicare with my concerns. Trying to order bilateral braces for ankles, knees, elbows and shoulder (which I have seen several times now) is unheard of an unethical!!"

63.     Despite Ms. Hiller's assurances, Dr. Obeid resigned from his work through Lifeline by email on December 28, 2018.  As set forth below, Dr. Obeid expressed concerns that the individuals speaking to the patients were not medical professionals, that there was no medical assessment or exam of these patients, and that after "learning more about this kind of practice from online sources, it is more like a kick back to the physician to sign these prescriptions."

---

**From:** Chadi Obeid
**Sent:** Friday, December 28, 2018 10:23 PM
**To:** alicia@lifelinerecruiting.com <alicia@lifelinerecruiting.com>
**Cc:** Julie Tremmel <JulieT@lifelinerecruiting.com>
**Subject:** Agreement termination

Hello,

I am Dr Chadi Obeid, I started to do telemedicine with your company to provide DME and braces for Medicare beneficiaries today.

I did not have adequate tutorial to understand exactly my responsibilities, my understanding I would be reviewing medical records and assess the necessity of these devices, the assignments were sent to me were actually phone calls conversations between non medical professional and the beneficiaries without medical assessment nor exam.

learning more about this kind of practice from online sources, it is more like a kick back to the physician to sign these prescriptions.

I would like to terminate our agreement effective immediately, and have the charts reviewed by me to be retracted.

---

*A Nurse Practitioner from New Hampshire Also Quit Working for Lifeline and Expressed*
*Concerns Both That the Recordings on the Consults Direct Portal Were Inconsistent with the*
*Medical Records and That They Sometimes Did Not Support Medical Necessity*

64.     Another one of the practitioners identified in the Google Hangout communications was Jonathan Attias, NP.  On November 5, 2020, investigators interviewed Mr. Attias.  Mr. Attias indicated that he is a nurse practitioner in New Hampshire and confirmed that

he worked with Lifeline to prescribe DME from around November 2018 to about December 2018 or January 2019.

65.     Mr. Attias quit his position with Lifeline due to his concerns.  These concerns included that the recordings with the patients did not document the details necessary for him to make an appropriate decision.  Attias was also concerned that there were discrepancies between what was pre-filled out on the portal to what the patient actually said during the calls.

66.     Mr. Attias recalled expressing some of these concerns with Julie Tremmel and Alicia Hiller from Lifeline, and he stated that no one attempted to sway his opinion.

*A Physician in Alabama Quit Working with Lifeline Over His Expressed Concerns That the DME Orders Were Not Medically Appropriate, the Patient Intake Forms Did Not Appear To Be Completed by a Medical Professional (As He Had Been Told), and His Research Indicated That There Were Ongoing Fraud Schemes Involving DME Orders Generated by Telemarketers*

67.     Investigators obtained information through a related investigation that Dr. David Hardin, a physician in Alabama, was identified as another practitioner who worked through Lifeline to prescribe DME.  Dr. Hardin's counsel provided investigators with copies of electronic messages and other correspondence between Dr. Hardin and Lifeline.

68.     In an email to Julie Tremmel (JulieT@lifelinerecruiting.com) dated November 14, 2018, Dr. Hardin wrote: "I will say some of the brace requests coming in have been suspicious and not medically appropriate given the information in the call."

69.     On January 15, 2019, Dr. Hardin signed a letter (copying his personal legal counsel) that he transmitted to Alicia Hiller, terminating his agreement with Lifeline and demanded that Lifeline and its clients cease and desist from using his identifier from any billing immediately and that Lifeline and/or its affiliated clients immediately refund any third-party payor funds.

21

70.     In support of his demand that Lifeline stop using his identifier and refund any funds paid for any DME billed pursuant to his telehealth consults, Dr. Hardin summarized his dealings with Lifeline, including the following excerpts taken from his demand letter:

At the outset of the Agreement, it was my understanding, according to the LLR Telehealth Practitioner Qualifying Questions ("Qualifying Questions") provided to me, attached hereto as **Exhibit A**, that all patients to whom I would provide telehealth services would "**undergo a complete <u>intake triage</u> completed by a <u>Certified Medical Assistant</u> ['CMA'] or <u>Certified Nursing Assistant</u> ['CNA']**" prior to my provision of any telehealth consult services. The Qualifying Questions also state, "Consultations are requested either directly via the patient portal or en-mass as requested by one of the healthcare partners."

Over the course of the short time I have provided telehealth consult services under the Agreement, I have previously raised concerns with LLR regarding the form of patient communication required for the provision of telehealth consult services under the Agreement. On November 14, 2018, the day after I completed my first telehealth consults under the Agreement, I inquired via email to Julie Tremmel, Executive Recruiter of LLR, asking whether to contact any patients for whom a patient intake form and recording were sent to me by LLR and/or its affiliated Clients for the provision of telehealth consult services. I also noted that certain DME requests I had received had been **suspicious** and **not medically appropriate** based on information provided in some patients' <u>recorded calls</u> and on the pre-populated medical intake form sent to me with the audio recording. In a follow-up email of November 14, 2018, Ms. Tremmel stated that "the voice recordings do suffice. . . ."

Despite LLR's representations that: (1) the voice recordings sufficed; (2) patient triage intake was completed by CMAs or CNAs; and (3) consultations were requested either directly by patients or by a healthcare partner, I began to question the method by which patient recordings were obtained. Before many of the patient recordings, I heard a dial tone indicating that the patient was being called rather than placing a call for telehealth consult services. Additionally, patient intake forms were inappropriately completed with respect to the durable medical equipment ("DME") prescriptions requested as compared to the patient complaints and did not appear to be completed by a knowledgeable CMA or CNA.

Although I denied any inappropriate or unsupported requests, I began to do research about suspect DME telehealth services. My findings indicated that many DME suppliers have begun to engage in the practice of purchasing "leads" from marketing companies which send the leads to telehealth companies, who contact the leads and record audio and/or visual encounters with the leads and then transmit the recordings to physicians (often young physicians) for physicians to provide telehealth consult services so that the physician orders for DME, such as braces, may then be sent to the DME suppliers for fulfillment.

71.     Dr. Hardin provided investigators with an email dated January 15, 2019, that he received from Alicia Hiller (alicia@lifelinerecruiting.com), copying Julie Tremmel (JulieT@lifelinerecruiting.com), acknowledging receipt of his termination and demand letter.

**Records Provided to the Government Further Establish that Lifeline Knew That Many of the DME Orders Were Not Medically Necessary, That the Intake/Triage Records Were Often Substantively Inconsistent with the Recordings, That the Intake/Triage Was Completed by Telemarketers and Not Medical Professionals, and That—Despite This Information--Lifeline Sought Out "Happy Clickers" to Approve the DME Orders**

72.     In or about October 2020, federal investigators asked Mr. Geronimo, the owner of Consults Direct, as part of his cooperation in his criminal case (referenced above) to provide them with communications between Consults Direct and Lifeline.  According to Mr. Geronimo, he contacted a former Consults Direct employee, Louie "Luke" Cabanatuan, who reportedly was, and still is, located in the Philippines.  Mr. Geronimo indicated that Mr. Cabanatuan's job was to coordinate the Consults Direct online portal and the doctors hired by Lifeline to review medical orders.  Mr. Cabanatuan's duties also included handling communications with Alicia Hiller and other employees of Lifeline.

73.     According to Mr. Geronimo, Mr. Cabanatuan provided him with screenshots that Mr. Cabanatuan made of his electronic communications that Mr. Cabanatuan had with Alicia Hiller and other employees at Lifeline.  These electronic communications included conversations on Google Hangouts (hereinafter referred to as the "Google Hangout Screenshots").

74.     Mr. Geronimo provided copies of screenshots to federal investigators in or about October 2020.

75.      Upon federal investigators' review of these Google Hangout Screenshots, one of the individuals who participated in these Google Hangout exchanges is identified as "Alicia." Additionally, this person identified as "Alicia" exchanges messages on the electronic conversation that include snapshots of emails sent to alicia@lifelinerecruiting.com, the email address known to belong to Alicia Hiller.  For example, the following is an excerpt from the

Google Hangout Screenshots, which is a message from Alicia containing a screenshot of an email addressed to alicia@lifelinerecruiting.com:



76.     In a separate proffer interview with federal investigators, Mr. Geronimo stated that he was introduced to Lifeline Recruiting and Alicia Hiller in July or August 2018.

77.     As discussed in more detail above, the interviews with, and documents provided by, some of the practitioners who worked with Consults Direct through Lifeline confirmed that the practitioners corresponded with Alicia Hiller at the email address: alicia@lifelinerecruiting.com, corroborating that the "Alicia" identified in the Google Hangout Screenshots is Alicia Hiller, the President of Lifeline.

78.     In addition to the communications with and about practitioners identified above, and corroborated through interviews with them and supporting documentation, the Google Hangouts Screenshots provided by Sajid Geronimo set forth additional evidence that persons at Lifeline were aware of, and aided and abetted in, Consults Direct's scheme to defraud Medicare by creating, and causing the submission of, DME orders that were not medically reasonable and necessary.

79.     For example, the Google Hangouts Screenshots reveal that on or about December 15, 2018, Alicia Hiller appears to have sent a message on Google Hangouts with a copy of a physician's resignation email.  In the copied email, the physician writes: "Long story short, I am concerned about medicare fraud with this company and **resign effective immediately!** I do also plan on contacting medicare with my concerns. Trying to order bilateral braces for ankles, knees, elbows and shoulder (which I have seen several times now) is unheard of an unethical!!" (emphasis in original).



80.     Then, on December 26, 2018, Ms. Hiller sent a message on Google Hangouts copying another resignation email from a different practitioner.  This practitioner stated that "[t]here are too many inaccuracies in what is populated in the chart against what the patient's [sic] are saying during the encounters. . . .  Legally, this could be a violation of the Anti-Kickback Statute."



81.     On December 28, 2018, Ms. Hiller sent a message on Google Hangouts and subsequently copied what appears to be a text message between her and Jonathan Attias, the nurse practitioner from New Hampshire.  Ms. Hiller stated that "Attias is 0 for 6 on bad consults," and noted that Mr. Attias complained that the "recordings don't match the transcript or Rx itself," consistent with Mr. Attias's interview with law enforcement (described above):



82.     Consistent with what Dr. Chadi Obeid told law enforcement investigators and the December 28, 2018 email to Ms. Hiller that he provided to the investigators, on December 28, 2018, Ms. Hiller sent another message on Google Hangouts copying the email from Dr. Obeid stating that he was resigning from Lifeline.  Ms. Hiller followed this message by saying, "Fuck" and then directed that all Georgia consults be later moved to a different practitioner named "[E]llis."



83.     The next morning, on December 29, 2018, Ms. Hiller sent another message on Google Hangouts, emphasizing again that Dr. Chadi Obeid had resigned and that "[E]llis" would take his place.  Ms. Hiller wrote that Ellis "is a happy clicker so at leat [sic] we have that."  She also asked whether there "is any easy place to see denials and who seems to deny more than the others so we can get replaements [sic]?"



84.     On January 8, 2019, Ms. Hiller sent a series of messages on Google Hangouts indicating that one of the practitioners played a recording of a patient phone call that she described as "pretty bad" and noting, "It's gross how rude and pushy the guy is…. [I] am hearing this more and more how bad these recordings are."



85.     One day later, after complaining about the nature of the recorded phone calls soliciting and "triaging" patients, Ms. Hiller, on January 9, 2019, sent a message on Google Hangouts in response to an email from a Consults Direct employee to a practitioner regarding the

29

origin of these calls.  Ms. Hiller reacted to the employee's use of the word "marketers," and

stated: "[I] thought we weren't supposed to say that?"



86.     On February 18, 2019, Ms. Hiller sent a message on Google Hangouts copying

another resignation email from a practitioner who stated that, "[a]fter listening to these

screenings, there is no way in good conscious [sic] that I can make an accurate diagnosis or write

a prescription for these individuals…. [A]t the current level that these screenings and recordings

are being performed I cant [sic] ethically approve any of these requests."





87.      On or about February 1, 2019, Ms. Hiller sent another message on Google

Hangouts copying an email from a practitioner who resigned "[e]ffective immediately" and

directed that "[a]ll consults that have been completed since 01/01/2019 need to be cancelled

immediately and not processed.  This company is doing questionable procedures and I do not

want to be involved with them anymore."



88.      On February 27, 2019, Ms. Hiller sent a message on Google Hangouts asking for

someone to provide a "report" on four different apparent practitioners who she claimed were

31

"threatening lawyers."  Ms. Hiller further requests that someone contact the providers "before

they call medicare and consults direct gets audited."



89.     On February 28, 2019, in response to a message on Google Hangouts that patients

were being contacted, Ms. Hiller responded: "[c]all the providers… we don't keep them calm

they call atty's and we all get in trouble."



90.     The screenshots provided by Mr. Geronimo also included copies of

communications with other persons utilizing the same "lifelinerecruiting.com" email addresses.

For example, there is one screenshot of an email message from Colleen Brown to Jamie Hulshof

dated January 29, 2019 at an email of jamie@lifelinerecruiting.com.  Similarly, the screenshots

include a copy of an email dated January 31, 2019 from a person to luke@consults.direct and

kate@lifelinecruiting.com where the person indicated that he "has reviewed three cases"  but had

a number of questions concerning the review process.

**The Investigation Revealed That Lifeline Is Currently Recruiting Practitioners to Work with Another Client Who Is Soliciting Medicare Beneficiaries for Cancer Genetic Testing and Contracting With Practitioners—Through Lifeline—To Approve Orders That Are Not Medically Necessary**

91.     As set forth below, further investigation revealed that Lifeline is currently

recruiting practitioners to work for clients to approve orders for medically unnecessary cancer

genetic laboratory testing.

*Medicare and Cancer Genetic Laboratory Testing*

92.     Genetic tests are laboratory tests designed to identify specific inherited mutations

in a patient's genes.  These genetic variations may affect a patient's risk of developing certain

diseases or how the patient responds to medications.

93.     Genetic tests related to a patient's hereditary predisposition for cancer are

commonly referred to as "CGx" tests.  CGx testing uses DNA sequencing to detect mutations in

genes that could indicate a higher risk of developing certain types of cancers in the future.  CGx

testing is not a method of diagnosing whether an individual presently has cancer.

94.     In order to conduct a CGx test, a laboratory must obtain a DNA sample from a

patient.  Such samples are typically obtained from the patient's saliva by using a cheek (buccal)

swab to collect sufficient cells to provide a genetic profile.  The DNA is then submitted to the

laboratory for analysis.

95.     Medicare excludes from coverage genetic tests "that are not reasonable and

necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a

malformed body member."  42 U.S.C. § 1395y(a)(1)(A).  Accordingly, except in a few specific

instances, Medicare coverage does not extend to CGx tests when they are used for *screening* purposes instead of for diagnosis or treatment.

96.     In fact, Medicare only covers certain traditional cancer screening tests in a few specific instances, such as mammography for breast cancer, *see* 42 U.S.C. § 1395y(a)(1)(F); 42 C.F.R. § 411.15(k)(6); and prostate cancer screening tests, *see* 42 U.S.C. § 1395y(a)(1)(G); 42 C.F.R. § 411.15(k)(9).

97.     Generally, however, whenever these tests are not being used for the diagnosis or treatment of a patient, Medicare does not cover a cancer screening test—including CGx—unless specified by statute, regulation, or Medicare policy.  In fact, the only CGx screening that Medicare covers is a specific genetic laboratory test (known as the CologuardTM test) used to test asymptomatic 50 to 85-year old Medicare beneficiaries at average risk of developing colorectal cancer.  *See* Ctrs. Medicare & Medicaid Servs., National Coverage Determination for Colorectal Cancer Screening TESTs (210.3).  In short, except for the CologuardTM test, Medicare does not cover CGx testing used for screening purposes.  Rather Medicare generally only covers CGx testing when it is used for the diagnosis or treatment of a patient.

98.     But even if a CGx test is ordered for diagnostic purposes, Medicare regulations make clear that Medicare will not cover that diagnostic test unless the order comes from the beneficiary's "treating" physician.  42 C.F.R. § 410.32(a).  As defined in the regulations, the "treating" physician is "the physician who furnishes a consultation or treats a beneficiary for a specific medical problem *and who uses the results in the management of the beneficiary's specific medical problem*."  *Id.* (emphasis added).  In other words, Medicare will not cover a diagnostic laboratory test, such as a CGx diagnostic test, ordered by a physician who does not then use the results of that test to treat the beneficiary's specific medical problem.  This same

rule also applies to nonphysician practitioners operating within their scope of practice. *Id.* § 410.32(a)(2).

99.     Accordingly, other than the specific Cologuard™ test, Medicare only covers a CGx test (1) that is ordered for diagnosis or treatment of an illness or injury—as opposed to screening—that is ordered by a practitioner who (2) is treating the beneficiary for a specific medical problem (e.g., cancer or suspected cancer) and (3) will use the results of the CGx diagnostic test in the management of that beneficiary's specific medical problem.

*Background on Nationwide CGx Fraud Schemes*

100.    In September 2019, federal law enforcement conducted a nationwide takedown of multiple laboratories, marketers, and practitioners who were ordering and processing medically unnecessary CGx tests for Medicare beneficiaries.

101.    Similar to the DME fraud schemes discussed above, federal law enforcement discovered that the laboratories and marketers employed medical practitioners to review and sign orders for CGx testing for solicited Medicare beneficiaries who sent DNA samples to laboratories.  The marketers often contracted with the medical practitioners for this review process utilizing locum tenens companies.

102.    The nationwide investigation has revealed that many of these CGx orders were not being used in the diagnosis or treatment of cancer patients but were simply screening tests. As such, these CGx tests did not meet Medicare's coverage criteria.  Furthermore, these CGx tests were ordered by practitioners who were not the treating practitioners required for Medicare coverage of legitimate CGx testing used for diagnostic or treatment purposes.  These practitioners typically had no pre-existing physician-patient relationship with the beneficiaries,

and, in some instances never even interacted with the beneficiaries through a phone call or other means.

103.     While the nationwide takedown in September 2019 was successful in shutting down many of the entities that perpetuated this fraud scheme, law enforcement investigators have discovered that other entities have continued to bill Medicare for CGx testing that is used for screening purposes and that is being ordered by practitioners who are not treating the beneficiaries for cancer or really any specific medical problem.

104.     As set forth below, the government's investigation has revealed that Lifeline is working with a client who is recruiting practitioners to authorize CGx tests used for screening purposes in violation of Medicare's regulations.

*In October 2020, Lifeline Solicited Hugh Deery II, M.D., a Cooperating Doctor in the Western District of Michigan, to Perform Purported Telehealth CGx Screenings on Behalf of a Client*

105.     As discussed above, Hugh Deery II, M.D., was a physician located in Petoskey, Michigan, who previously worked with Lifeline to sign DME orders for Consults Direct.  On or around September 21, 2020, Dr. Deery proffered with federal investigators regarding his involvement with Lifeline and Consults Direct in 2018 and 2019.

106.     Shortly after his proffer, on October 15, 2020, Dr. Deery received an unsolicited email from Jasmine Azure (jasmine@lifelinerecruiting.com), noting that she is the Director of Recruiting at Lifeline.  Ms. Azure's email asked Dr. Deery if he would be interested in doing "COVID screenings."

107.     Dr. Deery, through counsel, promptly notified federal investigators of this communication from Lifeline.  Because federal investigators were already investigating Lifeline's role in the Consults Direct DME fraud scheme, and because federal investigators were aware of potential fraud schemes involving screening for the Covid-19 virus, federal

investigators took this opportunity to utilize Dr. Deery as a cooperating practitioner to see what kind of work Lifeline and its clients were currently conducting.

108.    Though Dr. Deery was unable to take the initial position offered by Lifeline, Lifeline later extended him an invitation with another client identified as "InWerx" towards the end of October 2020.  With the consent of federal investigators, Dr. Deery accepted this position through Lifeline for InWerx.

109.    According to its website, InWerx purports to be a provider of healthcare managed IT services.  *See* https://inwerx.com/managed-services/ (last visited Jan. 20, 2021).

110.    On October 29, 2020, Ms. Azure sent an introduction email to an individual named "Michael" with Dr. Deery's contact information, explaining that Dr. Deery "is eager to assist with the telemed projects at InWerx and is able to get started right away."

111.    Later that day, Dr. Deery had a recorded phone call with "Michael" from InWerx. On that call, Michael explained that one of his clients operates a series of laboratories in Texas that perform a number of laboratory tests, including CGx testing.  He also explained to Dr. Deery that people sign up or register to see if they qualify for CGx testing by answering a series of questions.  If the patients qualify, they then receive a call from the "quality assurance team" to "verify the information."  Michael further described that once the quality assurance team verifies the information, they "live transfer" the patient to the practitioner.

112.    Michael stated that, during the "live transfer," the practitioner has the opportunity to speak with the patient and answer any questions they patient may have.  The practitioner may then sign or deny a pre-completed requisition form on an online platform, as well as make some changes to the form if necessary.  On the call, Dr. Deery agreed to start receiving patients, and Michael said he would follow up with onboarding material.

113.    On or around October 29, 2020, an individual identifying himself as "Michael Stein" emailed Dr. Deery with a link to onboarding information.

114.    Part of the onboarding material provided to Dr. Deery included an instruction guide for accessing and using an online telehealth portal.  The instruction guide further provided instructions for reviewing and approving CGx testing ("Hereditary Cancer Test Requisition Form"), including a sample requisition form for CGx testing.  Consistent with Michael's explanations, the instruction guide shows that the requisition forms are pre-populated and that the practitioner can electronically sign the requisition form or deny the request on the telehealth portal.  The instruction guide further includes a page entitled "CGX TESTING INFO" and indicates "The Health Awareness Project only prequalifies individuals who meet Medicare's guidelines for cancer genetic testing."  This "CGX TESTING INFO" also sets forth "Qualifying factors for Cancer Genetics Test," stating that, "[i]n order to qualify for testing, the patient must have or had a personal history of cancer."  The "CGX TESTING INFO" also asserts: "Whether you have cancer, had cancer, or have no current symptoms, this simple very important test can identify if YOU have an increased risk of developing cancer."  However, the "CGX TESTING INFO" does not set forth the actual criteria for Medicare coverage for CGx testing, as described in detail above.

115.    In or around December 2020, Dr. Deery began taking live transfers of patients as part of his work for InWerx for CGx testing.

116.    On December 1, 2020, Dr. Deery spoke with C.W., a 70-year old male Medicare beneficiary from North Street, Michigan, via a live transfer.  Dr. Deery provided federal investigators with the completed "Hereditary Cancer Test Requisition Form" for AmeriHealth, a laboratory reportedly based in Dallas, Texas, that identifies C.W. as a Medicare beneficiary and

Dr. Deery as the "Ordering Provider."  This CGx requisition form orders the "Comprehensive" panel with multiple genes and indicates that the patient has a personal history of bladder cancer twelve years prior when C.W. was 58-years old.  The CGx requisition form also notes that C.W. has a sister who had breast cancer.  However, the CGx requisition form does not indicate that C.W. is currently being treated or diagnosed with cancer or any other illness or injury or identify any other practitioner who is doing so.



117.    On the recorded phone call between Dr. Deery and C.W., C.W. explained to Dr. Deery that he is requesting the CGx test because he "just got a call."  C.W. confirmed that he had bladder cancer twelve years ago and that it is "all good" and "been twelve years."  C.W. also confirmed that his sister, uncle, and mother had cancer, but that he understood that his test was just for "genetic screening" and "awareness."

118.    Contrary to Michael from InWerx's assurances and the instruction guide provided to Dr. Deery that only individuals "who meet Medicare's guidelines for cancer genetic testing" would be prequalified and live transferred to Dr. Deery, C.W. did not meet Medicare's coverage criteria for CGx testing.  First, the ordered CGx test is not being used to diagnose or treat any illness or injury.  Second, the test was not referred by a "treating" physician, nor is Dr. Deery C.W.'s "treating" physician as he is not treating C.W. for any specific medical problem.  Third, neither Dr. Deery nor any "treating" practitioner intended to use the results of the CGx test in the management of any specific medical problem for C.W.  Rather, as C.W. acknowledged on the call, this CGx test was solely for "genetic screening" and "awareness."

119.    Despite this fact, the pre-filled requisition form that was provided to Dr. Deery to sign included an "Informed Consent, Medical Necessity and Authorization" box stating, in part:

> I am the patient's treating physician and this order is based upon Medicare's requirement that the testing is not ordered for the purposes of screening but for the diagnosis and treatment of the patient's individual medical condition.

120.    In the month of December 2020, Dr. Deery received additional CGx requisition forms and was transferred live calls from his work with InWerx.  Similar to the order for CGx testing for C.W., these CGx requisition forms and the recorded live calls demonstrated that these individuals did not qualify for Medicare coverage of CGx testing.

121.     In addition to the information obtained from Dr. Deery's cooperation and recent interactions with Lifeline, InWerx, and a person identified as Michael Stein, I obtained information that HHS-OIG agents in Florida are separately investigating AmeriHealth, its parent company, and other entities and individuals including Michael Stein involving a scheme to generate medically unnecessary orders for CGx testing of Medicare beneficiaries and the related solicitation and payment of unlawful kickbacks for the referral of such unnecessary CGx testing. I further learned that one cooperating witness has come forward in that investigation and provided information concerning AmeriHealth.  According to that witness, AmeriHealth's parent company, using the name the Health Awareness Project, is involved in marketing efforts that mainly consist of using Facebook and other websites to aggressively target Medicare beneficiaries and convince them to take genetic tests.  According to the cooperating witness, this business then mails a testing kit for the patient to complete and obtains a medical practitioner's authorization to conduct the test.  After the start of the Covid-19 pandemic, AmeriHealth's parent company started using telehealth services to obtain these authorizations.

122.     Based on CMS data obtained during the course of the investigation of AmeriHealth, its parent company, and others, between April 2020 and January 2021, AmeriHealth and another laboratory also owned by the same parent company reportedly billed Medicare approximately $75 million for cancer and cardiac genetic tests and have received $55 million in payments for these tests.

123.     That same CMS data reveals that, between approximately April 2020 and December 2020, a single nurse practitioner, NP1, was responsible for authorizing approximately $50 million, or roughly 90%, of AmeriHealth's and the related entity's billings in that period. CMS billing data suggests he/she approved testing at AmeriHealth and the related laboratory for

41

approximately 5,000 different beneficiaries in just seven months.  Based on this affiant's training

and experience, legitimate laboratories receive referrals from numerous different medical

professionals.  In contrast, data showing that one medical professional refers a substantial

percentage of patients to a laboratory is indicative of an illegal kickback arrangement.

124.    Investigators interviewed NP1 twice, including most recently in or around

October 2020, regarding his/her Medicare telemedicine prescriptions.  After his/her first

interview, NP1 contacted law enforcement to inform them that he/she was recruited to work for

Michael Stein's telemedicine company.

125.    I also learned that, as part of this investigation of AmeriHealth, its parent

company, the Health Awareness Project, and other individuals, investigators also obtained a

contract purported to be for IT/Software services.  The contract is signed by Michael Stein.  I

learned that witness statements and other evidence obtained in that investigation, including email

communications, revealed that Stein's company was not providing IT/Software services but,

rather, was providing medical professionals who could perform purported telehealth

consultations.

126.    Based on this information, the evidence gathered to date establishes that Lifeline

continues to solicit practitioners to work with clients who are engaged in healthcare fraud and

other crimes related to the use of telemedicine platforms to review and approve medically

unnecessary items and tests.  Consistent with the other CGx fraud schemes investigated and

prosecuted throughout the country, there is probable cause that Lifeline's client, InWerx, and

other associated entities are engaged in a scheme to defraud Medicare by soliciting practitioners

to approve and sign laboratory requisition forms for CGx testing that does not qualify under the

Medicare guidelines and is, in fact, only for screening purposes.  Moreover, there is probable

cause that employees of Lifeline utilized Google accounts, as they did to facilitate the Consults Direct DME fraud scheme, to communicate with InWerx and others and to recruit individual practitioners, like Dr. Deery, to review and sign these CGx screening test orders.

### Lifeline Utilizes Google to Host Its Website and Email and Utilizes Google Features, such as Google Hangouts, Using Their Google-Associated Email

127.    On January 29, 2021, an HHS-OIG digital forensic examiner confirmed that he verified that Google hosts the Lifeline website and email domain.  He uses several websites to verify such information.  For verifying the host of email addresses he uses https://mxtoolbox.com/.  MX records, known as Mail Exchanger records are used to identify which server should be used when sending emails to an address at the domain that the records are for. The MX record typically indicates which internet service provider hosts the server containing the email.  For websites he uses https://whois.domaintools.com/.  Whois lookup is a publicly available free search tool that gives the public the ability to look up point of contact and information related to a domain name, e.g., yahoo.com.

128.    After a review of records in this investigation, federal investigators have identified the following email addresses associated with the "lifelinerecruiting.com" domain hosted by Google:

        a.   alicia@lifelinerecruiting.com

        b.   jay@lifelinerecruiting.com

        c.   juliet@lifelinerecruitinig.com

        d.   jamie@lifelinerecruiting.com

        e.   kate@lifelinerecruiting.com

        f.   jasmine@lifelinerecruiting.com

        g.   mary@lifelinerecruiting.com

h.   shawnis@lifelinerecruiting.com

**Background Concerning Google**

129.    In my training and experience, and after consulting with others knowledgeable in this area, I have learned that Google provides a variety of on-line services to the public, such as Gmail, Google Voice, various messaging platforms (including Google Hangouts), online wallet services, mapping/navigation services, and more. Google also owns the Android Operating System software found on upwards of 80% of cellular phones throughout the world. Because of this, Google maintains a plethora of records associated with the various services and software they provide. When registering for many of the various types of Google accounts, Google asks subscribers to provide basic personal information, such as the subscriber's full name, physical address, telephone numbers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Additionally, during the user registration process Google may also record certain identification numbers for the device through which the user accessed Google, such as serial numbers, International Mobile Equipment Identity ("IMEI") numbers, Mobile Equipment Identifier ("MEID") numbers, Electronic Serial Number ("ESN"), etc.

130.    Through many of the services offered by Google, a subscriber can store files, address books, contact or buddy lists, calendar data, and pictures on servers maintained and/or owned by Google. Google's email service, called "Gmail" allows users to send and receive electronic messages which are routed through servers maintained and/or owned by Google. The numerous messaging and VOIP platforms allow users to communicate with one another by routing conversations through servers maintained and/or owned by Google. These various types

of content are often useful in investigations to determine who is using a specific account, who they are communicating with, and the subject of the users' conversations.

131.    In general, an email that is sent to a Google subscriber is stored in the subscriber's "mail box" on Google servers until the subscriber deletes the email. If the subscriber does not delete the message, the message can remain on Google servers indefinitely. Even if the subscriber deletes the email, it may continue to be available on Google's servers for a certain period of time.

132.    Aside from content information, Google also records and maintains records of certain types of metadata, such as IP addresses utilized by a user to access Google and geolocation information derived from GPS/cellular signal/Wi-Fi signal/Bluetooth connections of the device through which the user accessed Google. Furthermore, Google keeps records that can reveal Google accounts associated to one another by virtue of the electronic device through which the accounts were accessed, such as the same computer or mobile phone. This includes accounts that are linked by "cookies," which are small pieces of text sent to the user's internet browser when visiting websites. These records, although not personally generated by the user in the way content is created, are a byproduct of how the services are facilitated and offered by Google.  Google also stores communications from its cross-platform messaging application, Google Hangouts, associated with users' Google accounts.

133.    In my training and experience, and after consulting with others knowledgeable in this area, the types of information maintained by Google may constitute evidence of the crimes under investigation. Among other things, the requested information may be relevant in confirming or revealing the true identities of the users of the accounts; may assist in the identification of co-conspirators and/or victims; may provide precise location information for the

users of the accounts; may provide context to the communications conducted through the accounts; and may provide other content relevant to the ongoing investigation references above. Based on my training and my experience, I know that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

134.     Last, stored electronic data may provide relevant insight into Google account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (*e.g.*, communications relating to the crime), or consciousness of guilt (*e.g.*, deleting communications in an effort to conceal them from law enforcement).

## **CONCLUSION**

135.     As described above, this investigation has revealed that probable cause exists to search Lifeline's Google accounts for evidence, instrumentalities, and/or fruits of crimes committed by Consults Direct and associated practitioners, including Dr. Hugh Deery II and Dr. Colleen Browne, related to the Consults Direct DME fraud scheme.  Additionally, probable cause exists to search Lifeline's Google accounts for evidence, instrumentalities, and/or fruits of crimes committed by Lifeline and its employees related to the Consults Direct DME fraud scheme.  Finally, probable cause exists to search Lifeline's Google accounts for evidence, instrumentalities, and/or fruits of crimes being committed by Lifeline's existing clients, including InWerx, the Health Awareness Project, AmeriHealth, and contracted practitioners related to the review and approval of medically unnecessary CGx testing.

136.     Based on the forgoing, I request that the Court issue the proposed search warrant. Because the warrant will be served on Google who will then compile the requested records at a

time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

## **REQUEST FOR SEALING**

137.    I further request that the Court order that all papers in support of this application, including the affidavit and search warrant, be sealed until further order of the Court.  These documents discuss an ongoing criminal investigation that is neither public nor known to all of the targets of the investigation.  Accordingly, there is good cause to seal these documents because their premature disclosure may give targets an opportunity to flee/continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, notify confederates, or otherwise seriously jeopardize the investigation.